UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

PAULA MARMADUKE,                    )
                                    )
            Plaintiff,              )
                                    )
      v.                            ) No. 4:10CV42 FRB
                                    )
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

## MEMORANDUM AND ORDER

        This cause is before the Court on appeal of an adverse
ruling of the Social Security Administration.   All matters are
pending before the undersigned United States Magistrate Judge, with
consent of the parties, pursuant to 28 U.S.C. § 636(c).

## I.  Procedural History

        On April 25, 2007, plaintiff Paula Marmaduke filed an
application for Disability Insurance Benefits pursuant to Title II,
42 U.S.C. §§ 401, et seq.; and an application for Supplemental
Security Income pursuant to Title XVI, 42 U.S.C. §§ 1381, et seq.,
in which she claimed she became disabled on July 20, 2004.  (Tr.
134-36, 137-39.)  After receiving a partially favorable decision on
previously filed applications, plaintiff amended her alleged period
of disability to a closed period of October 20, 2006, through
February 14, 2008.   (Tr. 156.)[1]   On initial consideration, the

_____

        [1]On October 19, 2006, an Administrative Law Judge (ALJ) entered
a partially favorable decision on plaintiff's previously filed

Social Security Administration denied plaintiff's claims for benefits. (Tr. 93, 97-101.) On May 13, 2009, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 23-71.) Plaintiff testified and was represented by counsel. Plaintiff's friend and a vocational expert also testified at the hearing. On June 1, 2009, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 9-20.) On December 8, 2009, after review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-4.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on May 13, 2009, plaintiff testified in response to questions posed by the ALJ and counsel. At the time of the hearing, plaintiff was forty-eight years of age. Plaintiff stands five feet, two inches tall and weighs 147 pounds. Plaintiff is right-handed. (Tr. 28-29.) Plaintiff was previously married and has three children. Plaintiff currently lives in a low-income apartment located in an apartment complex. (Tr. 26-28.) Plaintiff

---

applications, finding plaintiff to have been under a disability from July 19, 2004, to October 5, 2005, but not subsequent to that period. (Tr. 75-91.) With respect to the applications at issue in the instant cause of action, plaintiff amended her alleged onset date to October 20, 2006, the date after the ALJ's partially favorable decision.

left high school in the eleventh grade to help raise her deceased sister's children. Plaintiff received no training subsequent to high school. Plaintiff has not obtained a GED. (Tr. 28.) Plaintiff recently began receiving unemployment compensation. (Tr. 30.)

Plaintiff's work history record shows that from 1990 to 1991, plaintiff worked for Maritz in a warehouse. From 1992 to 1994, plaintiff worked as a cashier in a grocery store. From 1994 to 1996, plaintiff worked as a team leader in a restaurant. From 1996 to 1998, plaintiff worked for Maritz in a warehouse. From 1998 to 2001, plaintiff worked for Federal Express as a courier. From September to November 2003, plaintiff worked as an assembler at a photo shop. From January to March 2005, plaintiff worked in a deli at a truck stop. From May to July 2005, plaintiff worked as a caretaker for the elderly. (Tr. 157.)

Plaintiff testified that she last worked as a laundromat attendant from January to March 2009, but was fired because she was not performing the work properly. (Tr. 30-32.) Plaintiff testified that she worked for three months as a cashier at a gas station prior to working at the laundromat, but that she was let go by the new owner. Plaintiff testified that prior to her work at the gas station, she worked as a cashier at a Dollar General store, but left that employment after three weeks because of conflicts with the supervisor. (Tr. 33.) Prior to working at Dollar

General, plaintiff worked for three weeks as a cashier at Diehls. Plaintiff testified that she left that employment because she kept dropping things. (Tr. 34.)

Plaintiff testified that she is claustrophobic and panics. With respect to the alleged period of disability, that is, between October 20, 2006, and February 14, 2008, plaintiff testified that she could not work because of bipolar disorder and post-traumatic depression, and because she could not comprehend things. (Tr. 39-40.) Plaintiff testified that she experienced manic and depressive episodes during this period, and that she felt she was on a roller coaster. (Tr. 51.) Plaintiff testified that she experienced crying spells, once or twice a day, lasting from an hour to an hour and a half. (Tr. 47-48.) Plaintiff testified that there were no triggers for the crying spells, and that they occurred unpredictably. Plaintiff testified that she did not want to get out of bed during this period and that, for a period of three or four months, she did not want to leave her room and would sometimes go days without bathing or changing her clothes. (Tr. 48-49.) Plaintiff testified that on one or two occasions, she stayed awake for more than twenty-four hours but did not engage in any dangerous activity. (Tr. 51-52.) Plaintiff testified that she also experienced panic attacks once or twice a week during this period. Plaintiff testified that she felt nervous and stressed, and that her chest felt so tight she felt she could not breathe.

(Tr. 49.)

Plaintiff testified that she took only prescription medication for her mental condition, but that such medication did not significantly help. (Tr. 39-40.) Plaintiff testified that the medication caused her to experience headaches and feel zombie-like. (Tr. 53.) Plaintiff testified that she suffered withdrawal symptoms when her Xanax was discontinued, but that she was subsequently started on Lorazepam. Plaintiff testified that she has not seen a psychiatrist or psychologist since 2002, but that she was recently referred to one. Plaintiff testified that she has never had any psychiatric hospitalizations. (Tr. 40-41.)

Plaintiff testified that her arm condition also prevented her from working during the relevant period because of tendinitis, "trigger thumb," and carpal tunnel syndrome in the right hand and arm. (Tr. 39, 43.) Plaintiff testified that she could pick up items from a table and could write, but that she sometimes dropped things because of tingling and pain in her arm and hand. (Tr. 43, 55.) Plaintiff testified that she relied primarily on her left hand and would cradle large items in the crook of her right arm. (Tr. 43-44, 54.) Plaintiff testified that she also had difficulty with performing small manipulative functions such as buttons, zippers, and tying shoes. (Tr. 55-56.)

Plaintiff testified that she smokes less than one-half of a pack of cigarettes a day. (Tr. 44.) Plaintiff testified that

she previously used illegal drugs but stopped using them in 1995 when she underwent treatment.  (Tr. 45.)

Plaintiff testified that she can read but has difficulty with comprehension.  Plaintiff testified that she can perform simple arithmetic.  Plaintiff testified that she can write but that her hand gets tired.  (Tr. 29.)  Plaintiff testified that she currently performs housework such as cooking, dishes, laundry, and vacuuming, but that she receives help from her sons and from a friend.  (Tr. 46-47.)  Plaintiff testified that she recently traveled to Chicago, Illinois, and drove part of the way.  (Tr. 45-46.)  Plaintiff testified that during the relevant period of alleged disability, she sometimes visited her niece and would take her out for ice cream.  (Tr. 42-43.)  Plaintiff testified that she also babysat an eighteen-month-old child once or twice a week during the relevant period.  (Tr. 56.)

B.   Testimony of Plaintiff's Friend

Melissa Williams, plaintiff's friend, testified at the hearing in response to questions posed by the ALJ and counsel.  Ms. Williams testified that she and plaintiff had been friends for twenty-eight years and that she saw plaintiff on a daily basis.  (Tr. 57.)  Ms. Williams testified that during the relevant period, she observed plaintiff experience panic attacks approximately once every other day, during which plaintiff had trouble breathing and would break out in a sweat.  Ms. Williams testified that plaintiff

could not be around a lot of people, and that she would have to talk plaintiff through an episode. Ms. Williams testified that plaintiff had anxiety and worried a lot about what other people thought. (Tr. 58.) Ms. Williams testified that she accompanied plaintiff to the doctor and that plaintiff's medication did not work. (Tr. 59.)

Ms. Williams testified that she works as a certified nurse's assistant, and that plaintiff currently comes to her house every morning to help Ms. Williams' six-year-old twins get ready for the school bus inasmuch as Ms. Williams is at work during that time. Ms. Williams also testified that plaintiff currently cooks but that she has difficulty handling pots and pans because of her grip problems. (Tr. 60-62.)

C. Testimony of Vocational Expert

Vocational expert Delores Gonzalez testified at the hearing in response to questions posed by the ALJ and counsel. Ms. Gonzalez characterized plaintiff's past work as a cashier as light and unskilled. Ms. Gonzalez characterized plaintiff's past work as a sales clerk and cook as light and semi-skilled. Ms. Gonzalez characterized plaintiff's past work as an assembler in a factory and as a laundry attendant as medium and unskilled. Finally, Ms. Gonzalez characterized plaintiff's past work as a courier as medium and semi-skilled. (Tr. 65-67.)

The ALJ asked Ms. Gonzalez to assume an individual with

plaintiff's education, training and work experience during the relevant closed period, and to further assume that

> the individual can lift, carry 20 pounds
> occasionally, 10 pounds frequently. Stand/
> walk six hours out of eight, sit six hours out
> of eight. I want to limit the handling and
> gross manipulation by the dominant -- right
> dominant hand to only occasionally. This
> individual can perform some complex tasks, can
> perform repetitive work according to set
> procedure, sequence, and pace. Understand,
> remember, and carry out at least simple
> instructions, non-detailed tasks. . . .
> [T]here is no limitation on the left hand[.]

(Tr. 67.)

Ms. Gonzalez testified that such an individual would not be able to perform any of plaintiff's past work, but that such a person could perform work as a school bus monitor, of which 630 such jobs exist in the St. Louis metropolitan area and 80,680 nationally. Ms. Gonzalez also testified that such a person could work as a sandwich board carrier, of which 670 such jobs exist in the St. Louis metropolitan area; 1,150 in the State of Missouri; and 84,150 nationally. Ms. Gonzales testified that the person could also work as a callout operator, of which 800 such jobs exist in the St. Louis metropolitan area; 1,190 in the State of Missouri; and 67,400 nationally. (Tr. 68.)

The ALJ then asked Ms. Gonzalez to assume an individual with the same characteristics as those described above, but that such an individual would also be limited to occasional reaching

overhead with the right hand.  Ms. Gonzalez testified that such an individual would be able to perform the work previously described. (Tr. 68.)

The ALJ then asked Ms. Gonzalez to assume an individual with the same characteristics, but that such person could

> understand, remember, and carry out at least
> simple instructions, non-detailed tasks,
> maintain concentration and attention for two-
> hour segments over an eight-hour period,
> demonstrate adequate judgment to make simple
> work-related decisions, respond appropriately
> to supervisors and coworkers in a task-
> oriented setting where contact with others is
> casual and infrequent.

(Tr. 68-69.)

Ms. Gonzalez testified that such a person could not perform any of the jobs previously described, but could perform other work such as folding machine operator, of which 2,070 such jobs exist in the St. Louis metropolitan area; 3,600 in the State of Missouri; and 138,990 nationally.  Ms. Gonzalez also testified that such a person could perform work as surveillance system monitor, of which 630 such jobs exist in the St. Louis metropolitan area; 1,980 in the State of Missouri; and 81,410 nationally.  (Tr. 69.)

When asked to consider the same individual, but one who experiences panic attacks every other day, having a duration of at least thirty minutes each, Ms. Gonzalez testified that such a circumstance would preclude competitive employment.  (Tr. 69-70.)

On July 20, 2005, plaintiff was admitted to the emergency department at Jefferson Memorial Hospital with complaints of chest wall strain in relation to a lifting injury sustained at work.  It was noted that plaintiff was taking Lorazepam[3] for anxiety.  Plaintiff was prescribed Ultram[4] for pain and was discharged that same date.  (Tr. 246-58.)

Plaintiff was admitted to the emergency department at Jefferson Memorial Hospital on December 8, 2005, with complaints relating to an axillary abscess.  It was noted that plaintiff suffered from bipolar disorder and took Lamictal,[5] Lorazepam and

---

[2]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council.  This evidence consists of treatment notes dated September 2, 2009, from the Great Mines Health Center.  (Tr. 328-29.)  The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence.  Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).  For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

[3]Lorazepam is a benzodiazepine used to relieve anxiety.  Medline Plus (last revised Oct. 1, 2020)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682053.html>.

[4]Ultram (Tramadol) is used to relieve moderate to moderately severe pain.  Medline Plus (last reviewed Feb. 1, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

[5]Lamictal is an anti-seizure medication used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder.  Medline Plus (last revised Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695007.html>.

Valium.[6]  Plaintiff was prescribed Motrin and an antibiotic and was discharged that same date.  (Tr. 260-68.)

On January 18, 2006, plaintiff was admitted to the emergency department at Jefferson Memorial Hospital with complaints relating to a labial abscess.  Plaintiff's condition of bipolar disorder was noted, as well as her medications of Trazodone,[7] Lamictal and Lorazepam.  Medication was prescribed for plaintiff's current condition, and she was discharged that same date.  (Tr. 237-45.)

Plaintiff was admitted to the emergency department at Jefferson Memorial Hospital on November 5, 2006, with complaints relating to a labial abscess.  No other diagnoses or conditions were noted.  (Tr. 226-36.)

Plaintiff underwent a consultative physical examination on July 18, 2007, for disability determinations.  Plaintiff reported to Dr. Loreta Mendoza that she currently lived in a rented, ranch-style home with her fiancé and forty-six-year-old disabled brother.  Plaintiff reported that the brother helped clean the house.  Plaintiff also reported that she babysat an eighteen-month-old grandchild two or three times a week.  Plaintiff's

---

[6]Valium is used to treat anxiety and muscle spasms.  Medline Plus (last reviewed Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682047.html>.

[7]Trazodone is used to treat depression.  Medline Plus (last revised Aug. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html>.

primary physical complaints were of problems with her right hand and right knee.  With respect to her right hand, plaintiff reported that she has a trigger thumb which locks at the first joint, and that she has some numbness in the last three fingers.  Plaintiff reported having previous carpal tunnel surgery in 2001 and 2003-04, but that she currently did not have a strong grip and she tended to drop things.  Plaintiff reported that she has hypersensitivity about the wrist and palm area with shooting pain upon touch. Plaintiff reported that she can feed herself, cut her own food, write legibly, can still do buttoning, and can pick up objects. Plaintiff expressed difficulty, however, with holding objects given her weak grip and sensitivity to touch.  Plaintiff also reported pain in her elbow.  With respect to her right knee, plaintiff reported that she has occasional discomfort and tenderness to pressure, but that she did not have many complaints regarding the knee.  Plaintiff reported that she walks on a treadmill two or three times a week for five minutes, walks around the block at her apartment, and keeps up with the eighteen-month-old child whom she babysits.  (Tr. 270-75.)

Dr. Mendoza conducted a physical examination of plaintiff which showed sensitivity to touch about the right wrist and palm. Plaintiff's strength of grasp or grip in the right hand was noted not to be as strong as in the left, measuring 4/5, but Dr. Mendoza noted that she could not remove her finger easily from plaintiff's

grasp. It was noted that plaintiff had strong pinching power between the right thumb and index finger and middle finger, but weak pinching power between the right thumb and the fourth and fifth fingers. Plaintiff could pick up objects of different sizes from a flat surface with no problem. Dr. Mendoza noted that plaintiff could feed herself, but that "sometimes if she doesn't pay attention to it, she drops her fork." Plaintiff had limited range of motion about the wrist, and full range of motion about the elbow. Plaintiff felt tenderness about the elbow on deep pressure. It was noted that plaintiff had no problem with the shoulder area. Physical examination of the lower extremities showed mild crepitus, full flexion, and mild tenderness on palpation of the right patella. Physical examination was otherwise unremarkable. Upon conclusion of the examination, Dr. Mendoza diagnosed plaintiff with mild tennis elbow; status post carpal tunnel surgery over the right wrist, with hypersensitivity to touch over the wrist and on the thenar eminence of the right hand; decreased strength of grip and a little less dexterity with the right hand; and status post surgery on the right knee, probable chondromalacia, with tenderness over the rim of the patella. (Tr. 270-75.)

On July 18, 2007, plaintiff underwent a consultative psychological examination for disability determinations. Plaintiff's chief complaints were "[e]motional, psychological, bipolar, and posttraumatic stress." Plaintiff also reported that

- 13 -

she had problems with her right hand and knee and that she had uterine cancer. Dr. Thomas Davant Johns noted plaintiff to be agitated, emotionally labile and very tangential, although plaintiff could be redirected relatively easily. Dr. Johns noted that plaintiff could possibly be undergoing benzodiazepine withdrawal. With respect to depression and bipolar disorder, plaintiff reported that she last received psychiatric treatment one year prior and received psychotropic medication which did not help her condition. Plaintiff reported that she had been taking Lamictal for the previous seven months as prescribed by her primary care physician, and that she "love[d] it." Plaintiff reported having had no psychiatric hospitalization. Dr. Johns noted plaintiff to appear depressed and agitated with some vegetative signs of depression, including disturbed sleep and decreased energy. Plaintiff reported problems with memory, but Dr. Johns opined that such condition was trivial and likely age-related. Plaintiff reported that she enjoyed swimming, her niece, and when children come by. Plaintiff reported occasional hopelessness and helplessness, and of having no self esteem. Plaintiff reported having no suicidal ideation. (Tr. 277-83.)

Upon Dr. Johns' examination relating to bipolar disorder, plaintiff reported having "excitement in [her] heart," with panic and anxiety attacks. Dr. Johns determined these to be anxiety-related symptoms rather than manic symptoms associated with bipolar

- 14 -

disorder. Plaintiff denied ever having any period of time where there was a decreased need for sleep. Dr. Johns opined that plaintiff did not have bipolar disorder. With respect to PTSD, plaintiff reported symptoms associated with depression. When asked, plaintiff could not identify any traumatic event she had experienced other than being told that her physical problems were "in [her] head." Dr. Johns opined that plaintiff did not have PTSD. (Tr. 277-83.)

With respect to substance abuse, plaintiff reported to Dr. Johns that she had previously been a habitual user of meth-amphetamine, but that she successfully quit except for a two-day relapse in 2002. Plaintiff reported that she had become addicted to benzodiazepine — mainly Xanax[8] and Lorazepam, and had obtained such substances from doctors and off the street. Plaintiff reported that she recently sought treatment from Com-Trea for the abuse. Plaintiff reported that she has not had such substances for three weeks and was currently experiencing symptoms of withdrawal. Plaintiff also reported, however, that her friends give her Xanax to "stave off her withdrawals." Plaintiff reported her current medications to be ibuprofen and Lamictal. (Tr. 277-83.)

Plaintiff reported to Dr. Johns that she used to get along well with supervisors and co-workers, but that she now has

---

[8]Xanax is a benzodiazepine used to treat anxiety disorders and panic disorder. Medline Plus (last revised Nov. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html>.

trouble getting along with "virtually everyone." Mental status examination showed plaintiff to be coherent, relevant and logical. Plaintiff displayed no flight of ideas or perseveration, but showed some tangentiality which required much redirection. Plaintiff was not delusional or hallucinating. Dr. Johns noted plaintiff not to display any disorganized thinking. Sensorium examination was unremarkable. Dr. Johns noted plaintiff to have only minimal interference with activities of daily living, such as needing help with small buttons and limited lifting. Plaintiff reported socializing with her fiancé, getting out of the house once or twice a week, taking her children out for ice cream, and socializing with one friend. Dr. Johns noted that plaintiff's social functioning appeared to be intact and that plaintiff was "capable of getting along with family, friends and people in general." Plaintiff's appearance and ability to care for personal needs was noted to be mildly impaired. Dr. Johns noted plaintiff's concentration, persistence and pace to be affected by benzodiazepine withdrawal, but opined that once plaintiff was completely withdrawn from such dependence she would be capable of completing simple tasks in a timely manner over a sustained period of time. (Tr. 277-83.)

Upon conclusion of the examination, Dr. Johns diagnosed plaintiff with depressive disorder not otherwise specified, currently moderate without specific treatment; methamphetamine dependence, presumably in sustained full remission; and

benzodiazepine dependence. Dr. Johns assigned plaintiff a Global Assessment of Functioning (GAF) score of 60. Dr. Johns opined that plaintiff's prognosis was very guarded, given plaintiff's benzodiazepine dependence and lack of supervision over her current withdrawal. (Tr. 277-83.)

On August 6, 2007, Kyle DeVore, a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which he opined that plaintiff suffered from depressive disorder and methamphetamine/benzodiazepine dependence in early remission. Mr. DeVore opined that plaintiff had no limitations in her activities of daily living and had no difficulties in maintaining social functioning. Mr. DeVore further opined that plaintiff suffered moderate difficulties in maintaining concentration, persistence or pace. As to whether plaintiff suffered repeated episodes of decompensation, Mr. DeVore reported there to be insufficient evidence upon which to make a determination. Mr. DeVore opined that from October 2006 through the date of his report, plaintiff was capable of at least simple, work-related tasks. (Tr. 284-94.)

In a Mental Residual Functional Capacity Assessment completed August 6, 2007, Mr. DeVore opined that plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; in her ability to maintain attention and concentration for extended periods; in her ability to

work in coordination with or proximity to others without being distracted by them; in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; in her ability to respond appropriately to changes in the work setting; and in her ability to set realistic goals or make plans independently of others. In all other respects, Mr. DeVore opined that plaintiff was not significantly limited. In conclusion, Mr. DeVore opined that plaintiff retained the ability for simple to moderately complex work-related tasks. (Tr. 296-98.)

On August 6, 2007, S. Greenburg, a medical consultant with disability determinations, completed a Physical Residual Functional Capacity Assessment. In this assessment, Consultant Greenburg opined that plaintiff could occasionally lift and carry twenty pounds, and frequently lift and carry ten pounds. Consultant Greenburg further opined that plaintiff could stand and/ or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. Consultant Greenburg opined that plaintiff had no limitations in pushing or pulling. With respect to manipulative limitations, Consultant Greenburg opined that plaintiff was limited in her ability to handle, feel, and reach in all directions in that plaintiff could engage in such activities only occasionally with her right upper extremity. Consultant Greenburg opined that plaintiff had no postural, visual, communicative, or environmental limitations. (Tr. 299-304.)

On December 12, 2007, plaintiff visited Phillip Cummings, a family nurse practitioner at Great Mines Health Center of DeSoto. Nurse Cummings noted plaintiff's history of bipolar disorder, PTSD, drug abuse, hypertension, hysterectomy, carpal tunnel surgery, and knee surgery. Plaintiff reported that she was off of her psychotropic medications. Physical examination was unremarkable. Nurse Cummings' assessment of plaintiff was that she had bipolar disorder with significant depression, and hypertension. Symbyax[9] was prescribed. (Tr. 306.)

Plaintiff returned to Nurse Cummings on January 9, 2008, and reported experiencing confusion and nausea with Symbyax. Plaintiff was instructed to discontinue the medication. Lorazepam and Fluoxetine were prescribed. Lamictal was also restarted. Plaintiff was referred to a doctor for consultation. (Tr. 305.)

Plaintiff returned to Nurse Cummings on March 24, 2008, and reported that her anxiety and depression continued. Plaintiff also reported having back pain. Physical examination was unremarkable. Nurse Cummings noted plaintiff's anxiety and depression to be mild. Plaintiff was prescribed Meloxicam[10] and Fluoxetine. (Tr. 309-10.)

---

[9]Symbyax (Fluoxetine) is used to treat depression and panic attacks. Medline Plus (last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689006.html>.

[10]Meloxicam is used to relieve pain, tenderness, swelling, and stiffness cause by osteoarthritis and rheumatoid arthritis. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601242.html>.

On June 16, 2008, plaintiff reported to Nurse Cummings that her back pain had increased. Plaintiff also continued to complain of anxiety. Physical examination was unremarkable. Nurse Cummings noted the level of plaintiff's anxiety and depression to be mid to low. Nurse Cummings assessed plaintiff as having hypertension and anxiety disorder. Lorazepam, Lamictal, Tramadol, and Lisinopril[11] were prescribed. (Tr. 307-08.)

Plaintiff visited Nurse Cummings on October 15, 2008, and complained of anxiety and chronic back pain. Plaintiff was prescribed medications, including Lorazepam, Lorcet[12] and Fluoxetine. (Tr. 323.)

On January 29, 2009, plaintiff called the Great Mines Health Center and requested a refill of her pain medication, indicating that she fell the previous day and injured her back. Plaintiff was informed that she needed an appointment for the condition. (Tr. 319.)

On February 4, 2009, plaintiff called the Great Mines Health Center and requested a refill of her Lorazepam. Plaintiff reported that she "really need[ed]" the medication because she could not concentrate at school. (Tr. 318.)

---

[11]Lisinopril is used to treat high blood pressure. Medline Plus (last reviewed Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html>.

[12]Lorcet is used to relieve moderate to severe pain. Medline Plus (last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601006.html>.

Plaintiff visited Nurse Cummings on February 4, 2009, who noted plaintiff to be tearful and stressed.  Physical examination was unremarkable.  Nurse Cummings noted plaintiff's level of depression and anxiety to be moderate to severe.  Nurse Cummings assessed plaintiff as bipolar and instructed plaintiff to continue with Lamictal and Lorazepam.  Pristiq[13] was also prescribed.  (Tr. 316-17.)

On March 4, 2009, plaintiff failed to appear at the Great Mines Health Center for a scheduled appointment.  (Tr. 313.)

Plaintiff visited Nurse Cummings on April 1, 2009, with complaints relating to a dental abscess.  No other complaints were noted.  (Tr. 311-12.)

Plaintiff visited Nurse Cummings on September 2, 2009, with complaints of severe depression and anxiety.  Plaintiff reported feeling hopeless.  Plaintiff was diagnosed with depression and was prescribed Paroxetine,[14] Trazodone and Tramadol.  Plaintiff was also instructed to continue with Lorazepam.  (Tr. 328.)

### IV.  The ALJ's Decision

The ALJ found that plaintiff met the insured status

---

[13]Pristiq is used to treat depression.  Medline Plus (last revised Mar. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a608022.html>.

[14]Paroxetine is used to treat depression, panic disorder, social anxiety disorder, and PTSD.  Medline Plus (last revised Mar. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698032.html>.

requirements of the Social Security Act through December 31, 2008. The ALJ found that plaintiff did not engage in substantial gainful activity during the closed period of October 20, 2006, to February 14, 2008. The ALJ found that during this period, plaintiff had the following severe impairments: mild tennis elbow; status post carpal tunnel surgery over the right wrist; status post surgery of the right knee; depressive disorder, not otherwise specified; methamphetamine dependence, presumably in sustained full remission; and benzodiazepine dependence, but that such impairments, either singly or in combination, did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found plaintiff's allegations not to be credible. The ALJ found that, during the closed period, plaintiff had the residual functional capacity (RFC) to perform light work, except that plaintiff was limited to only occasional reaching overhead and handling/gross manipulative activities with her right hand. The ALJ found plaintiff able to understand, remember and carry out at least simple instructions and non-detailed tasks; able to perform work secondary to set procedures, sequence or pace; and able to perform some complex tasks. The ALJ determined that plaintiff was unable to perform her past relevant work during the closed period. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that there existed jobs in significant numbers in the national economy that plaintiff could have performed, and

specifically, school bus monitor, sandwich board carrier, and call-out operator. The ALJ thus found that plaintiff was not under a disability during the closed period of October 20, 2006, to February 14, 2008. (Tr. 12-20.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20

C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. Johnson

v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770;

Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ failed to consider all the evidence of record in determining plaintiff's RFC. Plaintiff also claims that the testimony obtained from the vocational expert cannot constitute substantial evidence upon which to find plaintiff not disabled inasmuch as such testimony was based upon the ALJ's flawed RFC determination. Plaintiff also claims that the vocational expert was not asked to consider plaintiff's moderate limitations, including her limitations in working around the general public. The Court will address each of plaintiff's contentions in turn.

A.    RFC Determination

At Step 4 of the sequential analysis, the ALJ is required

to determine a claimant's RFC. Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Residual functional capacity is what a claimant can do despite her limitations caused by her impairments. McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the disability claimant has the burden to establish her RFC, the ALJ bears the primary responsibility for assessing the RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. McGeorge, 321 F.3d at 768; see also Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); Eichelberger, 390 F.3d at 591; 20 C.F.R. §§ 404.1545(a), 404.1546(c).

In this cause, plaintiff claims that the ALJ failed to consider all the evidence of record when determining her RFC. Specifically, plaintiff claims that the ALJ failed to consider the testimony of lay witness Melissa Williams; failed to consider evidence of plaintiff's panic attacks; failed to consider the consultative examiner's findings regarding plaintiff's manipulative limitations; failed to consider the consultative examiner's findings regarding plaintiff's depressive symptoms; and failed to consider plaintiff's stress and resulting limitations regarding her ability to be around people. For the following reasons, the ALJ did not err in his consideration of the record when determining

plaintiff's RFC.

1.  *Testimony of Melissa Williams*

Plaintiff claims that the testimony of her friend, Melissa Williams, was consistent with plaintiff's testimony and other evidence of record regarding plaintiff's grip, limited use of her right hand, and presence of panic attacks, but that the ALJ failed to consider Ms. Williams' testimony in determining plaintiff's RFC.

Although the ALJ failed to specifically address Ms. Williams' testimony in his decision, such failure does not necessarily indicate that the testimony was not considered. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Montgomery v. Chater, 69 F.3d 273, 275 (8th Cir. 1995). "[A]n ALJ is not required to discuss every piece of evidence submitted." Black, 143 F.3d at 386. Nevertheless, given the ALJ's adequately supported adverse credibility determination regarding plaintiff's subjective complaints (see discussion below), the ALJ's failure to specifically address Ms. Williams' testimony had no bearing on the outcome of the decision inasmuch as the inconsistencies from which the ALJ discredited plaintiff's testimony would likewise discredit Ms. Williams' testimony. See Lorenzen v. Chater, 71 F.3d 316, 319 (8th Cir. 1995). See also Young, 221 F.3d at 1068; Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

In determining the credibility of a claimant's subjective

complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id. It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld. Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001); see also Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

In this cause, the ALJ set out numerous inconsistencies in the record to support his conclusion that plaintiff's complaints

were not credible. Among the ALJ's findings are numerous inconsistencies which would likewise discredit the testimony of Ms. Williams. Specifically, the ALJ noted that despite plaintiff's claims of debilitating conditions, she nevertheless was able to engage in a variety of daily activities, including cooking, cleaning, shopping, laundry, vacuuming, socializing with her fiancé, occasional driving, and babysitting an eighteen-month-old child. (Tr. 18.) The quality of such activities, plaintiff's ability to relate to others over a period of time, and plaintiff's independence demonstrated by such activities supports the ALJ's adverse credibility decision. See Wagner v. Astrue, 499 F.3d 842, 851-52 (8th Cir. 2007). See also Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007) ("extensive daily activities" included caring for eleven-year-old child, driving, fixing simple meals, housework, grocery shopping, and handling money); Tellez, 403 F.3d at 957 (cooking, laundry, bill-paying, and caring for special needs children inconsistent with allegation of total disability); Young, 221 F.3d at 1069 (evidence that claimant cooked, cleaned, did laundry, shopped, studied, exercised, and cared for two small children confirmed claimant's ability to work on a daily basis in national economy); Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (preparing meals, washing dishes and clothes, visiting with friends, watching television, and driving are inconsistent with a claim of total disability from a physical and/or mental

impairment). The ALJ also noted that plaintiff's claim of disabling effects from carpal tunnel was inconsistent with plaintiff's reported and observed ability to feed herself, cook her own meals, button clothing, and pick up different sized objects from a flat surface. See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996) (claim of disabling pain from carpal tunnel contradicted by claimant's performance of tasks involving fine manual dexterity, such as buttoning clothes, handling eating utensils, writing, and washing dishes). The ALJ also found plaintiff's complaints relating to her right knee not to be credible given her regular weekly exercise on a treadmill, walking around the block, and keeping up with an eighteen-month-old child. See Wagner, 499 F.3d at 845-46 (despite claims of chronic knee pain, claimant reported that he could walk one-half mile to one mile and stand for forty minutes); cf. Brosnahan v. Barnhart, 336 F.3d 671, (8th Cir. 2003) (after using a treadmill and exercise bike for a couple of days, claimant "ended up in bed").

Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. Goff, 421 F.3d at 793; Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Gulliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). Inasmuch as the same evidence that discredited plaintiff's own testimony concerning her limitations would likewise

discredit Ms. Williams' testimony, the ALJ did not err by his failure to specifically address Ms. Williams' testimony in his decision or to rely on Ms. Williams' testimony in his determination of plaintiff's RFC.

2. *Evidence of Plaintiff's Panic Attacks*

Plaintiff claims that the ALJ failed to consider evidence of record which supported plaintiff's claim that she experienced panic attacks during the alleged period of disability. Specifically, plaintiff claims that the ALJ failed to consider Ms. Williams' testimony relating to plaintiff's panic attacks, as well as the findings made by the consulting examiner regarding plaintiff's anxiety-related symptoms. For the reasons set out above, the ALJ did not err in failing to consider Ms. Williams' testimony regarding plaintiff's panic attacks. For the reasons set out below, the ALJ did not err in his consideration of Dr. Johns' consultative examination.

During her examination with Dr. Johns, plaintiff reported symptoms which she considered to be evidence of bipolar disorder. When asked if she ever experienced periods with significantly increased energy, plaintiff reported affirmatively that she has had "panic attacks and anxiety attacks, excitement in [her] heart." (Tr. 278.) Although Dr. Johns asked additional questions regarding such periods, he notably did not conclude that plaintiff suffered from panic disorder or anxiety disorder. Indeed, other than this

isolated comment, plaintiff offered no complaints or other symptoms of panic attacks.

In his decision, the ALJ noted plaintiff's statement to Dr. Johns regarding panic attacks, as well as other evidence from the examination relating to plaintiff's agitation, increased motor activity, and need for redirection. The ALJ noted, however, that such evidence "must be considered in context of other unremarkable findings of this date." (Tr. 15.) The ALJ then went on to consider the numerous other findings made by Dr. Johns regarding plaintiff's mental and cognitive abilities, which demonstrated little or no limitations. The ALJ also found it significant that plaintiff was assigned a GAF score of 60,[15] specifically noting the score to be "one point from the mild range[.]" (Tr. 15-16.)

A review of the record as a whole shows the ALJ not to have erred in his consideration of Dr. Johns' examination. To the extent plaintiff claims that the examination supports her claim that she suffered panic attacks, the ALJ properly noted that, while plaintiff made such a statement during the examination, a review of the findings in their totality shows plaintiff not to have been so

_____

[15]A GAF (Global Assessment of Functioning) score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000). A GAF score of 51 to 60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers).

limited.    Indeed,  the  only  evidence  of  record  to  support
plaintiff's  claim  that  she  suffered  panic  attacks  is  her  own
testimony and the testimony of her friend — properly found not to
be credible, and her isolated statement made during a consultative
examination with Dr. Johns.  There is no evidence that plaintiff
actively  sought  treatment  relating  to  panic  attacks  during  the
closed period.[16] Nor is there any evidence that during consultative
examinations,  plaintiff  exhibited  signs  or  symptoms  which  would
lead  a  medical  professional  to  diagnose  such  a  condition.    See
Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) ("While not
dispositive,  a  failure  to  seek  treatment  may  indicate  the  relative
seriousness  of  a  medical  problem.").    As  such,  in  light  of  the
evidence of record, the ALJ did not err in his consideration of Dr.
Johns' examination relating to plaintiff's mental impairment.  See
Page v. Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007).

    3.    *Manipulative Limitations*

      Plaintiff  claims  that  the  ALJ's  RFC  finding  that  she
could occasionally use her right hand for reaching overhead and for
handling  or  gross  manipulation  was  inconsistent  with  evidence  of
record demonstrating plaintiff to suffer significant limitations of
her right hand.  To the extent plaintiff claims that Ms. Williams'

---

[16]Plaintiff's  treatment  obtained  from  Nurse  Cummings  in
December  2007  and  January  2008  related  to  her  complaints  of
depression.    To  the  extent  plaintiff  sought  treatment  from  Nurse
Cummings  in  March  2008  for  anxiety,  Nurse  Cummings  noted  the
condition to be mild.

testimony shows plaintiff to have weak grip strength, the ALJ did not err in failing to consider Ms. Williams' testimony. (See discussion supra at Sec. V.A.1.) To the extent plaintiff claims that the ALJ's finding is inconsistent with the results from Dr. Mendoza' consultative physical examination, the ALJ did not err in his consideration of this examination for the reasons set forth below.

In his decision, the ALJ noted Dr. Mendoza's physical examination of plaintiff's right hand to show sensitivity to touch, mild diminishment of grip strength, and diminishment in range of motion. The ALJ also noted plaintiff's reports to Dr. Mendoza that she tended to drop things due to her lack of a strong grip in the hand. The ALJ noted, however, that such evidence "must also be considered in context of other unremarkable findings of this date." (Tr. 15.) The ALJ then went on to consider the numerous other findings made by Dr. Mendoza regarding plaintiff's right hand, which demonstrated limitations not rising to the significant level as plaintiff claims. Specifically, the ALJ noted plaintiff's grip strength to be only mildly diminished, with the grip measured to be 4/5. (Id.) Indeed, Dr. Mendoza noted that despite plaintiff's grip strength in the right hand not being as strong as in the left hand, "you cannot easily take your finger out of her grasp." (Tr. 272.) The ALJ also noted that plaintiff had strong pinch power between the thumb and index and middle fingers, could pick up

different objects from a flat surface, could write legibly, and could perform manipulative functions such as buttoning. (Tr. 15, 18.) Although Dr. Mendoza observed plaintiff to perform the buttoning skill slowly and to sometimes drop her fork when she was not paying attention, such observations are not inconsistent with the ALJ's opinion that plaintiff could perform handling and gross manipulative functions only occasionally. This is especially true where objective evidence from this examination also showed plaintiff's grip strength to be only mildly diminished with Dr. Mendoza expressing difficulty in removing her finger from plaintiff's grasp.

A review of the record as a whole shows substantial evidence to support the ALJ's RFC determination that plaintiff could occasionally perform handling and gross manipulative functions. Although not all the medical evidence "pointed in that direction," there nevertheless was a sufficient amount that did. See Moad v. Massanari, 260 F.3d 887, 892 (8th Cir. 2001). Cf. Zeiler v. Barnhart, 384 F.3d 932, 936 (8th Cir. 2004) (claimant's claimed loss of grip strength accommodated by ALJ's finding that she is limited to light work); Clark v. Chater, 75 F.3d 414 (8th Cir. 1996) (claimant with reduced grip strength could nevertheless perform the full range of light work with limited pushing and pulling). Because substantial evidence supports the ALJ's determination, it must be upheld; even if the record could also

have supported an opposite decision.  <u>Weikert</u>, 977 F.2d at 1252.

4.  *Depressive Symptoms*

Plaintiff claims that Dr. Johns diagnosed her with depressive disorder and noted during his examination that plaintiff was agitated, depressed, emotionally labile, and tangential with redirection required.  Plaintiff contends that, despite such findings, the ALJ failed to articulate any such limitations in his RFC determination.

Contrary to the plaintiff's assertion, a review of the ALJ's decision shows him to have thoroughly set forth Dr. Johns' findings made upon his examination, including those set out above by the plaintiff.  As noted <u>supra</u> at Sec. V.A.2, however, the ALJ also considered those findings by Dr. Johns which ran counter to those argued by plaintiff to be limiting.  Specifically, the ALJ noted:

> While the above findings and/or observations are supportive of some level of limitation, they must be considered in context of other unremarkable findings of this date.  To this end, it is noted speed of the claimant's speech was within normal limits, as were the quantity, quality of [sic] and productivity of her vocalizations.  There was not observed or reported any disorganized thinking, and there appeared to be no evidence for flight of ideas or perseveration.  Further, the claimant was not seen to be hallucinating or delusional. In terms of cognitive functioning, the claimant was completely oriented in all spheres.  Her memory was intact for the recall of her date of birth and social security number, the identification of four previous

> presidents, and the repeating of 6 of 6
> digits. Her concentration was intact for the
> performance of serial 3s at a moderate pace.
> Finally, her social judgment was seen to be
> intact.

(Tr. 15-16.)

Dr. Johns noted no mental limitations with respect to plaintiff's activities of daily living, nor any limitations with respect to plaintiff's social functioning. Indeed, Dr. Johns noted that plaintiff was capable of getting along with family, friends and people in general. Dr. Johns further stated that, from a psychological standpoint, plaintiff's current limitation in concentration, persistence or pace in completing simple tasks in a timely manner would be resolved upon plaintiff's complete withdrawal from benzodiazepine dependence.

This evidence from the only mental health examination relating to the closed period constitutes substantial evidence on the record as a whole upon which the ALJ could base his RFC determination that plaintiff did not suffer the mental limitations as urged here by plaintiff. Cf. Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995) (not error for ALJ to rely on report from examining mental health professional who noted claimant's anger and depression, but opined that plaintiff nevertheless had memory and concentration needed for work and would be able to get along with supervisors and co-workers). There simply is no other medical evidence in the record to support plaintiff's claims that she

suffered debilitating limitations on account of her mental impairment during the closed period in question. See Baldwin v. Barnhart, 349 F.3d 549, 557-58 (8th Cir. 2003) (medical reports, including reports from consultative examinations, revealed no condition that would limit claimant's ability to function in the workplace to a degree to render him disabled). For the ALJ not to find such debilitating limitations was not error.

    5.   *Ability to be Around People*

Finally, plaintiff claims that the ALJ erred in his failure to consider those portions of Mr. DeVore's reports, which included observations made by plaintiff's mother, in which he found that plaintiff experienced moderate limitations due to stress and being around people. Plaintiff claims that the ALJ erred by failing to include such limitations in his RFC determination.

In his PRTF, Mr. DeVore noted that in a Function Report completed for disability determinations, plaintiff's mother reported that plaintiff gets scared and confused when out alone, and does not handle stress and changes in routine well. In his mental RFC assessment, Mr. Devore opined that plaintiff had moderate limitations in her ability to work in coordination with or proximity to others without being distracted by them, and in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Although the ALJ considered Mr. DeVore's opinions (see Tr. 17, 18), he did not

include in his RFC determination any requirement that plaintiff be limited in her contact with other people or from stressful environments.

A claimant's RFC is a medical question. As such, some medical evidence must support the ALJ's RFC determination. Kroqmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002); Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 703-04 (8th Cir. 2001). The ALJ is "required to consider at least some supporting evidence from a [medical professional]" and should therefore obtain medical evidence that addresses the claimant's ability to function in the workplace. Hutsell, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Id. An RFC checklist completed by a non-treating, non-examining physician who has merely reviewed reports is not *medical* evidence as to how the claimant's impairments affect her ability to function and thus cannot alone constitute substantial evidence to support an ALJ's RFC assessment. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); Nunn v. Heckler, 732 F.2d 645, 649 (8th Cir. 1984).

Here, the only evidence before the ALJ that plaintiff experienced stress when around other people or should be limited in her contact with other people came from the testimony of Ms. Williams and Mr. DeVore's mental RFC checklist. For the reasons

set out <u>supra</u> at Sec. V.A.1, the ALJ did not err in failing to consider Ms. Williams' testimony in determining plaintiff's RFC. Inasmuch as Mr. DeVore's mental RFC checklist does not alone constitute medical evidence to support an RFC determination, the ALJ did not err in failing to include Mr. DeVore's opined limitations in plaintiff's RFC. This is especially true where there exists medical evidence in the record showing that plaintiff suffered no mental limitations with respect to activities of daily living, nor with respect to social functioning. Indeed, during his examination, Dr. Johns specifically noted that plaintiff was capable of getting along with family, friends and people in general.

If the ALJ were to include in his RFC determination the social limitations now urged by plaintiff, such limitations would have been based on nothing more than the opinion of a non-examining consultant, which cannot constitute substantial evidence upon which such a determination can be made. Nevland, 204 F.3d at 858. The ALJ therefore committed no error in failing to include such limitations.

B.   Testimony of Vocational Expert

Plaintiff claims that the testimony of the vocational expert cannot constitute substantial evidence to support the ALJ's decision inasmuch as such testimony was based upon a generally flawed RFC determination. Plaintiff also claims, specifically,

that such testimony cannot constitute substantial evidence inasmuch as it was not based upon a hypothetical question which included plaintiff's moderate limitations, including her limitations in working around the general public.

As discussed *supra* at Sec. V.A, the ALJ properly considered the evidence of record and determined that plaintiff's RFC and limitations did not preclude the performance of certain work activities during the closed period in question. This determination is supported by substantial evidence on the record as a whole. Because these limitations were supported by substantial evidence on the record as a whole, the hypothetical question posed to the vocational expert which included only these limitations was not flawed. Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir. 2004) (ALJ did not err in hypothetical question posed to vocational expert where he set out RFC which was supported by substantial evidence, and included only those impairments established by such evidence). In addition, inasmuch as the specific limitations now urged by plaintiff were not supported by some medical evidence in the record, they were properly not included in the ALJ's RFC determination. As such, the ALJ did not err in relying on vocational expert testimony which was based on a hypothetical question that did not include such limitations.

## VI. Conclusion

For the reasons set out above on the claims raised by

plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied.  Inasmuch as there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992).  Accordingly, because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff was not disabled during the closed period of October 20, 2006, to February 14, 2008, should be affirmed.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED** and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
_____
UNITED STATES MAGISTRATE JUDGE

Dated this  _15th_  day of March, 2011.

- 43 -